NATIONAL ADVERTISING COMPANY,
Plaintiff–Appellant,

v.

The CITY AND COUNTY OF DENVER,
Defendant–Appellee.

No. 88–1159.

United States Court of Appeals,
Tenth Circuit.

Aug. 16, 1990.

Alan A. Armour, Attorney, Littleton, Colo. (Darrell L. Campbell, Denver, Colo., with him on the brief), for plaintiff-appellant.

Stan M. Sharoff, Asst. City Atty. (Stephen H. Kaplan, City Atty., with him on the brief), Denver, Colo., for defendant-appellee.

Before SEYMOUR and McWILLIAMS, Circuit Judges, and PHILLIPS,* District Judge.

SEYMOUR, Circuit Judge.

Plaintiff National Advertising Company (National), a seller of billboard advertising space, seeks a declaratory judgment, injunctive relief, and damages stemming from two ordinances enacted by defendant City and County of Denver (Denver) that restricted billboards along freeways. National claimed that it was entitled to relief for violations of the First Amendment, the Just Compensation Clause as incorporated into the Fourteenth Amendment, and the Fourteenth Amendment due process and equal protection clauses. In a grant of partial summary judgment and a bench trial, the district court rejected all of National's claims. We affirm.

I.

For many years, Denver had on its books Section 46–4 (the old ordinance) prohibiting advertising within 660 feet of the edge of the right-of-way of a freeway, "unless such signs advertise or pertain wholly to a business conducted on the premises." *Rec.*, vol. I, doc. 5, exh. A at 2. Although the old ordinance permitted on-site signs with messages concerning the business conducted there, no similar exception existed for noncommercial messages. The old ordinance was still in effect when the Supreme Court in *Metromedia, Inc. v. City of San Diego,*

* Honorable Layn R. Phillips, United States District Judge for the Western District of Oklahoma, sitting by designation.

453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981), ruled that a similar ordinance favoring commercial speech over noncommercial speech violates the First Amendment. Denver took no immediate action respecting the old ordinance, however.

Several years later, National's attorney began to talk with Denver officials about amending the old ordinance to cure the alleged constitutional defect and to allow off-site advertising along freeways. Presumably in expectation of such an amendment, in 1984 National began to lease space alongside freeways, useable solely for erecting and maintaining billboards. Ultimately, National entered into thirty-four such leases, with terms of up to ten years.

By July 1985, Denver was responding to various pressures for reform of the old ordinance. National sponsored and submitted proposed legislation to Denver on July 9, 1985. *See* Appellee's Exhibit Addendum to Answer Brief, Def.'s exh. C at 2. Anti-billboard forces also contemplated submitting their own proposal.

On July 17, 1985, Dorothy Nepa, Denver's Zoning Administrator, notified the various billboard companies operating in Denver, including National, of proposed legislation amending or replacing the old ordinance. In her letter she announced:

"Should this legislation be approved by City Council, applications for permits for such devices will be accepted in the Department of Zoning Administration on the effective date of the ordinance. Review and processing of these applications will commence after this date."

*Id.* Def.'s exh. B. At trial, the district court interpreted this letter as an implicit indication that new applications would not be accepted pending enactment of a new ordinance. *See* rec., vol. VII, at 7. The district court also found that, as of July 17, Denver had ceased enforcing the old ordinance. Shortly thereafter, on August 1, National submitted fifteen applications for billboard permits along freeways, all of which were simply returned.

By September 25 and 26, the efforts of the various pro- and anti-billboard forces resulted in the submission to City Council of two different bills repealing the old ordinance. National supported and lobbied for CB 560, which would have permitted off-site commercial billboards along freeways subject to certain spacing and other limitations. *See* Appellee's Exhibit Addendum, Pl.'s exh. 36. The anti-billboard groups in Denver supported CB 561, which would have continued the prohibition of off-site commercial billboards. *See id.* at Pl.'s exh. 37. At hearings before the City Council on October 28, at which National's counsel testified extensively, CB 560 passed by one vote and CB 561 failed by an equal margin.

On November 1, Denver's mayor vetoed CB 560. In his veto message, he supported the prompt repeal of the old ordinance and urged City Council to replace it with an ordinance preventing any increase in billboards. He also instructed the City Council sponsors of CB 561 to work with the City Attorney's office in drafting a suitable replacement. That same day National submitted thirty-four applications for off-site billboards along freeways. Other companies submitted approximately sixty more.

On November 12, National filed this lawsuit seeking an injunction, declaratory relief, and damages arising from the alleged enforcement of the old ordinance, which it claimed violated the First Amendment under *Metromedia* and the due process and equal protection clauses of the Fourteenth Amendment. National also sought just compensation for an alleged unconstitutional taking of its thirty-four leaseholds.

On November 14, two weeks after National submitted its applications, Denver denied all of them, stating:

"Reason for Denial: Within 660 ft. of [freeway] ... Pending legislation, if passed, will repeal Section 46-4 and enact restrictions on freeways which will require the denial of this application under zoning ordinances."

*Id.* at Pl.'s exh. 1. The district court found that the city attorney's office and at least two city council members were actively pursuing a follow-up to the narrowly-defeated CB 561 in the time period between the veto of CB 560 and submission of the applications, on November 1, and their de-

nial on November 14. The court also found that a proposed replacement ordinance identical to CB 561 was filed in City Council on November 14. Finally, the district court concluded that National was aware of the status of CB 561 and its successor during this period through the involvement of its counsel, Gil Goldstein.

On November 22, notice was given that a public hearing on the proposed replacement ordinance, CB 712, was set for December 16. Both traffic safety and aesthetic justifications were debated at the hearing, and CB 712 (the new ordinance),[1] was enacted. In addition to repealing the old ordinance, the new ordinance bans all off-site commercial signs within 660 feet of a freeway. Within this area, on-site commercial signs under a certain size and noncommercial signs are permitted. Both parties agree that application of the new ordinance requires that a distinction be made between off-site noncommercial signs and off-site commercial signs. To aid in this distinction, the new ordinance defined an "off-site commercial sign" as follows:

"A sign which directs attention to a business, commodity, service, entertainment or attraction sold, offered or existing elsewhere than upon the same zone lot where such sign is displayed. This definition does not include noncommercial signs."

*Id.* at Pl.'s exh. 38.

When the new ordinance passed, National amended its complaint to add claims for declaratory and injunctive relief, as well as for damages under 42 U.S.C. § 1983 (1982) based on the new ordinance's alleged facial unconstitutionality. National premised its new claims not only on the First Amendment, but also on the due process and equal protection clauses of the Fourteenth Amendment, and the proscription against taking property without just compensation. National retained the claims concerning the now-repealed old ordinance.

On summary judgment, the district court held the new ordinance facially constitu-

tional and concluded that National's requests for declaratory and injunctive relief arising from the unconstitutionality of the old ordinance were mooted by its repeal. After a bench trial on the section 1983 claim for damages and the inverse condemnation claim involving the old ordinance, the district court ruled for Denver. In its oral findings of fact and conclusions of law, the district court held that the "pending ordinance doctrine" foreclosed these claims. National has appealed all of the district court's rulings.

## II.

In reviewing the district court's grant of summary judgment, we apply the same standard as the court below, *see* Fed.R. Civ.P. 56(c), and examine the district court's conclusions *de novo.* *See United Food & Commercial Workers Int'l Union v. Gold Star Sausage Co.,* 897 F.2d 1022, 1024 (10th Cir.1990). We review a district court's findings of fact at trial under the clearly erroneous standard, under which we will uphold a fact-finding unless we are " 'left with a definite and firm conviction that a mistake has been committed.' " *Everaard v. Hartford Accident & Indem. Co.,* 842 F.2d 1186, 1191 (10th Cir.1988) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948)). The district court's conclusions of law are reviewed *de novo.* *See In re Ruti–Sweetwater, Inc.,* 836 F.2d 1263, 1266 (10th Cir. 1988).

## III.

### A. Constitutionality of the New Ordinance

■ Denver's new ordinance prohibits off-site commercial signs within 660 feet of a freeway. On-site commercial and noncommercial signs are permitted. National first argues that this partial ban illegally regulates commercial speech.

---

**1.** The new ordinance was in all respects identical to CB 561, which earlier had failed by one vote.

Commercial speech receives less First Amendment protection than other constitutionally safeguarded expression. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 563, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980). To determine whether regulation of commercial speech is consistent with the First Amendment, the Court in *Central Hudson* has provided a four-part inquiry: (1) the speech must concern lawful activity and not be misleading; (2) the asserted governmental interest in regulating must be substantial; (3) the regulation must directly advance the governmental interest asserted; and (4) the regulation may not be more extensive than is necessary to serve that interest. *Id.* at 566, 100 S.Ct. at 2351. *See also Oklahoma Telecasters Ass'n v. Crisp*, 699 F.2d 490, 499–500 (10th Cir.1983) (applying *Central Hudson* four-part test), *rev'd on other grounds, Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984).

National's facial attack does not implicate the first part of the *Central Hudson* test since we deal here with no particular example of commercial speech. The governmental interests asserted, preserving aesthetic values and traffic safety, are clearly "substantial" within the meaning of the second part. *See Metromedia*, 453 U.S. at 507–08, 101 S.Ct. at 2892–93 (traffic safety and appearance of city are substantial governmental interests). National contends, however, that these interests are not "directly advanced" under the third part because permitting on-site commercial and noncommercial signs next to freeways already frustrates the asserted regulatory purposes. The Court in *Metromedia* addressed this argument:

> "[F]irst ..., the prohibition of offsite advertising is directly related to the stated objectives of traffic safety and esthetics. This is not altered by the fact that the ordinance is underinclusive because it permits onsite advertising. Second, the city may believe that offsite advertising, with its periodically changing content, presents a more acute problem than does onsite advertising."

*Id.* at 511, 101 S.Ct. at 2894. In addition, the preference for noncommercial over commercial advertising under the new ordinance is the kind of underinclusiveness the First Amendment tolerates.

The final inquiry in *Central Hudson* is whether the prohibition is more extensive than necessary to serve the asserted interests. Rejecting a strict "least restrictive means" standard, the Court in *Board of Trustees of the State Univ. of New York v. Fox*, — U.S. ——, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989), noted that the *Central Hudson* test must reflect the relatively limited measure of protection afforded commercial speech. *Id.* 109 S.Ct. at 3033. The Court therefore required only a "reasonable fit" between legislative ends and means. *Id.* at 3033–35. The fit need "not necessarily [be] perfect, ... but one whose scope [must be] 'in proportion to the interest served.'" *Id.* at 3035 (quoting *In re R.M.J.*, 455 U.S. 191, 203, 102 S.Ct. 929, 937–38, 71 L.Ed.2d 64 (1982)). A "narrowly tailored" regulation which does "not 'burden substantially more speech than is necessary to further the government's legitimate interests'" will suffice. *Id.* 109 S.Ct. at 3034 (quoting *Ward v. Rock Against Racism*, — U.S. ——, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989)).

Denver's new ordinance easily satisfies this requirement by prohibiting substantially less speech than a total ban, which National concedes is a constitutional alternative.[2] Even if something less than the prohibition of off-site commercial billboards might serve the same safety and aesthetic purposes, the limited prohibition here is certainly the "most direct and perhaps the only effective approach." *Metromedia*, 453 U.S. at 508, 101 S.Ct. at 2893. We

---

**2.** The Court in *Metromedia* observed that a content-neutral total ban may be permissible as a time, place and manner restriction, so long as other avenues of communication are available. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 516, 101 S.Ct. 2882, 2897, 69 L.Ed.2d 800 (1981) (quoting *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976)); *National Advertising Co. v. City of Orange*, 861 F.2d 246, 249 (9th Cir.1988).

therefore conclude that the new ordinance, considered facially, permissibly regulates commercial speech.

■ National also contends that the distinction between noncommercial and commercial speech which Denver must make to apply the new ordinance makes it invalid on its face. According to National, the new ordinance's failure to make a clear distinction between the two types of speech will result in the unconstitutional prohibition of noncommercial speech. The new ordinance also gives Denver's zoning authorities unfettered discretion to make content-based decisions, National maintains, concerning where to draw the line between commercial and noncommercial speech.

We agree with National that Denver's attempt to distinguish the two types of speech is not a model of clarity. Denver first defined commercial speech by adopting language implicitly approved by the Supreme Court in *Suffolk Outdoor Advertising Co. v. Hulse,* 439 U.S. 808, 99 S.Ct. 66, 58 L.Ed.2d 101 (1978) (dismissed for want of substantial federal question); *see also Metromedia,* 453 U.S. at 499, 101 S.Ct. at 2888 (approving *Suffolk* language).[3] Noncommercial speech was then defined as embracing any speech not within the definition of commercial speech. We cannot agree, however, that the new ordinance's failure to define the distinction with total clarity makes the ordinance facially invalid.

The Supreme Court and other courts have approved of statutes, orders, ordinances and the like which require a distinction between commercial and noncommercial speech. *See, e.g., Board of Trustees,* 109 S.Ct. at 3034–35 (resolution prohibiting only commercial speech subject to less constitutional scrutiny); *Posadas de Puerto Rico Assoc. v. Tourism Co. of Puerto Rico,* 478 U.S. 328, 344, 106 S.Ct. 2968, 2978, 92 L.Ed.2d 266 (1986) (validating regulations prohibiting advertising aimed at residents); *National Advertising Co. v.*

*City of Orange,* 861 F.2d 246, 250 (9th Cir.1988) (billboard ordinance construed as limiting only off-site commercial messages valid); *Naegele Outdoor Advertising, Inc. v. City of Durham,* 844 F.2d 172, 173–74 (4th Cir.1988) (same); *Georgia Outdoor Advertising, Inc. v. City of Waynesville,* 833 F.2d 43, 46 (4th Cir.1987) (same); *Major Media of the Southeast, Inc. v. City of Raleigh,* 792 F.2d 1269, 1272 (4th Cir.1986), cert. denied, 479 U.S. 1102, 107 S.Ct. 1334, 94 L.Ed.2d 185 (1987) (same).

Furthermore, Supreme Court decisions have provided ample guidance concerning the "common-sense distinction" between commercial and noncommercial speech. *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 455–56, 98 S.Ct. 1912, 1918–19, 56 L.Ed.2d 444 (1978); *see also Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 66, 103 S.Ct. 2875, 2879–80, 77 L.Ed.2d 469 (1983) (defining commercial speech). We agree with the Fourth Circuit that

> "sufficient guidance is given for such determination by City officials by the various decisions of the Court relating to billboards and commercial speech.... '[N]o codification of these terms is necessary, since the Supreme Court has already defined them....' Although an occasional marginal case might arise raising the question of whether on the particular facts the definition of commercial speech would be correct, such an infrequent possibility should not in itself justify a generalized charge that the ordinance itself is vague, given the guidance afforded by court decisions in the area."

*Major Media,* 792 F.2d at 1272–73 (citation omitted).

Our conclusion that the ordinance is not unconstitutionally vague also forecloses National's argument concerning city officials' "unfettered discretion" to determine what is regulated commercial speech. Far from being unfettered, Denver is bound by judicial precedent in determining what is

---

**3.** The ordinance in *Suffolk* defined a prohibited billboard as " '[a] sign which directs attention to a business, commodity, service, entertainment, or attraction sold, offered or existing elsewhere than upon the same lot where such sign is displayed.' " *Metromedia,* 453 U.S. at 499, 101 S.Ct. at 2888. The new ordinance adopts this language except for the addition of the word "zone" before "lot."

commercial speech. *Cf. Grayned v. City of Rockford,* 408 U.S. 104, 110, 92 S.Ct. 2294, 2299–00, 33 L.Ed.2d 222 (1972) (judicial precedent relevant in construing words of statute in vagueness challenge).

 National's argument that the ordinance will overreach to prohibit noncommercial speech also cannot stand. "Where expressive conduct is involved, 'the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.' " *ACORN v. City of Tulsa,* 835 F.2d 735, 742 (10th Cir.1987) (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 605, 93 S.Ct. 2908, 2912, 37 L.Ed.2d 830 (1973)). The requirement of substantial overbreadth avoids invalidation of a statute "where, despite some possibly impermissible application, the 'remainder of the statute ... covers a whole range of easily identifiable and constitutionally proscribable ... conduct....' " *Secretary of State v. Joseph H. Munson Co.,* 467 U.S. 947, 964–65, 104 S.Ct. 2839, 2851, 81 L.Ed.2d 786 (1984) (quoting *CSC v. Letter Carriers,* 413 U.S. 548, 580–81, 93 S.Ct. 2880, 2897–98, 37 L.Ed.2d 796 (1973)). Even with the guidance contained in the judicial definitions, *some* speech admittedly will be difficult to categorize.[4] But National has failed to show in this case that more than a small percentage of conceivable applications will raise serious definitional questions. Absent such a showing, National must demonstrate that the ordinance as applied to it is unconstitutional. *ACORN,* 835 F.2d at 742. National has not attempted to launch an "as applied" attack. Accordingly, we conclude that the new ordinance is facially consistent with the First Amendment.[5]

**4.** "It will always be true that the fertile legal 'imagination can conjure up hypothetical cases in which the meaning of [disputed] terms will be in nice question.' " *Grayned v. City of Rockford,* 408 U.S. 104, 110 n. 15, 92 S.Ct. 2294, 2300 n. 15, 33 L.Ed.2d 222 (1972) (quoting *American Communications Ass'n v. Douds,* 339 U.S. 382, 412, 70 S.Ct. 674, 690–91, 94 L.Ed. 925 (1950)).

**5.** National argues on appeal for the first time that the district court erred in deciding the constitutionality of CB 712 on summary judgment because plaintiff was denied an evidentia-

## B. Requests for Declaratory and Injunctive Relief from Enforcement of the Old Ordinance

 In its amended complaint, National requested a declaration that the old ordinance was unconstitutional, and an injunction prohibiting its enforcement or an order requiring Denver to grant its applications for off-site advertising permits. Approximately one month after National filed its amended complaint, the old ordinance was repealed. On the basis of that repeal, the district court dismissed as moot National's claims for declaratory and injunctive relief on summary judgment. On appeal, National argues that the district court should not have dismissed the claims for prospective relief because it had a right to issuance of the permits *before* the repeal of the old ordinance.

Regardless of the propriety of Denver's denial of National's permit applications, the district court was correct in dismissing National's claims for prospective relief as moot. Federal court jurisdiction depends on the existence of a case or controversy

" 'admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' The controversy must exist at all stages of the proceedings, 'not merely at the time the complaint is filed.' The relief sought must be capable of addressing the alleged harm."

*Blinder, Robinson & Co. v. United States Sec. & Exch. Comm'n,* 748 F.2d 1415, 1418 (10th Cir.1984) (citations omitted), *cert. denied,* 471 U.S. 1125, 105 S.Ct. 2655, 86 L.Ed.2d 272 (1985).

ry hearing to demonstrate the statute's facial invalidity. We disagree. We said in *ACORN v. City of Tulsa,* 835 F.2d 735, 740 (10th Cir.1987) that "a first amendment challenge to the facial validity of a statute is a strictly legal question; it does not involve the application of the statute in a specific factual setting.... [T]he facial validity of a statute is decided by reference to all of the conduct that is proscribed by the statute." The issue was properly decided on summary judgment.

At the time the district court held the claims moot, the new ordinance had been enacted and the old ordinance repealed. A declaratory judgment on the validity of a repealed ordinance is a textbook example of " 'advising what the law would be upon a hypothetical state of facts.' " *Id.; see also United States Dep't of the Treasury v. Galioto,* 477 U.S. 556, 559–60, 106 S.Ct. 2683, 2685–86, 91 L.Ed.2d 459 (1986) (amendment of federal statute excising portion under constitutional attack moots appeal); *Taxpayers for the Animas–La Plata Referendum v. Animas–La Plata Water Conservancy Dist.,* 739 F.2d 1472, 1478–79 (10th Cir.1984) (enactment of superseding state law mooted actions for injunctive and declaratory relief).

■ The district court's holding that the new ordinance is constitutional similarly renders meaningless any injunctive relief National seeks. Even if the permits had been issued, Denver could have revoked them under the new ordinance in effect at the time the district court ruled. *See Cline v. City of Boulder,* 168 Colo. 112, 450 P.2d 335, 338 (Colo.1969) (en banc) (municipality may revoke permit where zoning changed to prohibit use absent material change in reliance on issued permit). Thus, even assuming National was entitled to a permit before enactment of the new ordinance, it would have been immediately revocable from the time the new ordinance was enacted. Because the requested injunctive relief after enactment of the new ordinance would be meaningless, National's claim for injunctive relief is also moot.[6]

### C. National's Damages Claims

National sought damages under 42 U.S.C. § 1983 arising from Denver's alleged enforcement of an unconstitutional ordinance. National also brought a claim for inverse condemnation of its thirty-four billboard leaseholds alongside freeways. After a bench trial on these issues, the district court dismissed the damage claims and the condemnation claim on the theory that National's applications were denied not by virtue of enforcement of the old ordinance, but because of the pending new ordinance.

■ National takes issue not only with the district court's fact-findings, but also with its application of the "pending ordinance doctrine." According to this doctrine, a municipality may deny an application for a license or permit on the basis of a pending ordinance prohibiting the requested use. *See* 8 E. McQuillan, *Municipal Corporations* § 25.155 (3d ed. 1983). The rule is subject to two provisos: (1) the municipality cannot unreasonably or arbitrarily refuse or delay issuance of a permit, and (2) the ordinance must be "pending" when the application is denied. "Pending" in this context does not require that the proposal be before the city council, but only that "the appropriate administrative department of the city must be actively pursuing it." *Id.*

■ Colorado joined the majority of jurisdictions[7] when it applied a variant of the pending ordinance doctrine in the case of *Crittenden v. Hasser,* 41 Colo.App. 235, 585 P.2d 928 (Colo.Ct.App.1978). In *Crittenden,* the plaintiff applied for a fermented malt beverage outlet license while a proposed zoning change prohibiting such a use was under review. The proposed zoning change was adopted and the application was denied. In affirming the denial of the license on the basis of the zoning resolution, the court stated:

"This authority to enact a zoning resolution, and thereby restrict the use of property, exists even though an application for a license involving that use is pend-

---

**6.** The enactment of the new ordinance makes meritless National's argument that Denver's action is "capable of repetition, yet evading review" within the meaning of *Southern Pac. Terminal Co. v. Interstate Commerce Comm'n,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911).

**7.** *See* Annotation, *Retroactive Effect of Zoning Regulation, in Absence of Saving Clause, on Pending Application for Building Permit,* 50 A.L. R.3d 596, 607 (1972) ("zoning regulation may be retroactively applied to deny an application for a building permit, even though the permit could have been lawfully issued at the time of application"), and cases cited therein.

ing, the only proviso being that the Board had not unreasonably or arbitrarily refused or delayed issuance of the license. *See* 8 E. McQuillan, Municipal Corporations § 25.155 (3rd ed. J. Kightlinger 1976 rev.); ... This is particularly so where, as here, adoption of the zoning resolution was pending at the time the application for the fermented malt beverage license was made."

*Id.* 585 P.2d at 929. Significantly, the court invoked the pending ordinance doctrine as stated in McQuillan to justify its result.

The district court specifically found that National was deeply involved in proposing new legislation to Denver to replace the old ordinance. At the time National's applications were submitted, the old ordinance was not being enforced, and Denver had notified National of this fact and that applications would be considered based only on proposed replacement legislation.[8] When CB 560 was vetoed—the same day National submitted its applications—the Mayor specifically urged the proponents of the narrowly-defeated CB 561 (later CB 712, the new ordinance) to resubmit it. At least two city council members continued with this effort to fill the void left by CB 560's veto. The district court found that National was aware of these developments. The district court also found that CB 712 was filed in City Council two weeks after the veto, the same day the applications were denied.

We agree with the district court's conclusion that Denver properly denied the permits under the pending ordinance doctrine. Denver was actively pursuing enactment of CB 561 (later CB 712) well before National submitted its applications. During the time the applications were filed with Denver, CB 561 was in the process of being resubmitted. Denver acted promptly on National's November 1 applications, delivering responses in two weeks. The responses referred to proposed legislation which, at the time of denial, was before the city council. CB 712 was enacted into law approximately one month later. None of these developments unfairly surprised National, since it knew of the status of CB 561, later CB 712, at all relevant times. As we have held the new ordinance constitutional, the applications were lawfully denied and National's section 1983 claims accordingly fail.

### D. Inverse Condemnation

■ The district court held that because the permits were properly denied under the pending new ordinance, the denial did not result in an inverse condemnation. National claims on appeal that the denial rendered its billboard leaseholds worthless.

Regardless of the basis for the denial of the permits, or of whether a taking occurred, National's claim for a regulatory taking based on a zoning ordinance must be dismissed as unripe. *See Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 194–95, 105 S.Ct. 3108, 3120–21, 87 L.Ed.2d 126 (1985). In *Williamson County,* the Court indicated that "a property owner has not suffered a violation of the Just Compensation Clause until the owner has unsuccessfully attempted to obtain just compensation through the procedures provided by the State for obtaining such compensation." *Id.* at 195. National has not indicated in this case that it has unsuccessfully sought compensation under the eminent domain procedures of Colorado. *See* Colo.Rev. Stat. §§ 38–1–101 *et seq.* (1982). These procedures are available to an inverse condemnee to obtain compensation for an al-

---

8. National challenges the findings of the district court that the July 17 letter to the billboard companies implicitly communicated that no application would be accepted pending enactment of a new ordinance and that the old ordinance was no longer enforced. The findings are not clearly erroneous. To the contrary, Denver's July 17 letter clearly communicates its intention to consider permits only under the proposed replacement legislation. National's argument that Denver's written response in denying its permit applications belies this intention is without substance. The old ordinance was mentioned only in the context of its repeal: "Pending legislation, if passed, will repeal Section 4–64." That Denver mentioned the 660 foot boundary as a "reason for denial" is similarly inconclusive, since both the old ordinance and the proposed new ordinance contain the identical 660 foot boundary limitation.

**414**

leged "taking." *See Linnebur v. Public Serv. Co. of Colo.,* 716 P.2d 1120, 1123 (Colo.1986) (en banc) (citing *Ossman v. Mountain States Tel. & Tel. Co.,* 184 Colo. 360, 520 P.2d 738 (Colo.1974) (inverse condemnation action to be tried as if eminent domain proceeding)). We accordingly affirm the district court.

## IV.

To summarize, we hold that the new ordinance is facially valid under the First Amendment. We hold further that National's claims for declaratory and injunctive relief are moot. National's damage claims for deprivation of constitutional rights arising from denial of its applications for permits to construct signs fail in light of our conclusion that the denials were properly based on a facially valid pending ordinance. Finally, National's inverse condemnation claim is unripe.

The district court is AFFIRMED.